**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| **TEAM EXPRESS DISTRIBUTING LLC** | |
| **Plaintiff,** | **C.A. No.  5:15-cv-00994-DAE** |
| **v.** | |
| **JUNCTION SOLUTIONS, INC., MICROSOFT CORP., AND RSM US LLP** | |
| **Defendants.** | |

## TEAM EXPRESS DISTRIBUTING LLC'S THIRD AMENDED COMPLAINT

Plaintiff Team Express Distributing LLC ("Team Express") files this Third Amended Complaint ("Amended Complaint") against Defendants Junction Solutions, Inc. ("Junction"), Microsoft Corp. ("Microsoft"), and RSM US LLP ("RSM") (collectively, "Defendants"), and hereby states and alleges the following:

### I.       PRELIMINARY STATEMENT

1.      This suit arises from Defendants' fraudulent inducement of Team Express to purchase supposedly reliable enterprise software, Microsoft Dynamics AX 2012 R3, and implement it with a purported "expert"—certified and acclaimed by Microsoft itself.  But after months of work in implementing and using the software, it became apparent that neither the Microsoft Dynamics product, nor the knowledge and skill of the Junction implementation team was anything like what Defendants promised during the sales process.  Simply put, the software did not work.  It failed regularly, bringing Team Express's business to a halt each time it did.  Team Express was sold a product that Junction and Microsoft claimed was a mature, modern, fully-tested, flexible, stable, feature-rich software product from one of the world's leading

software companies; but in fact the product appears to be a fledgling, immature, untested, experimental "toolkit" that was largely mysterious even to Microsoft and Junction, who continually experimented to find solutions to its many problems.  Indeed, even after months of work after the "go live" date, the software remained incapable of matching the functionality of the *25-year-old* software it replaced—Ecometry.  The warehousing functionality caused utter chaos.  Payment processing was a circus, lurching between charging some customers a half-dozen times for the same order, then failing to refund or refunding too many times, while shipping product to others without charging them at all.  Simple orders could take minutes, and sometimes over an hour, merely to input into the system.  Unsurprisingly, customers were outraged by these problems and Team Express's reputation was deeply tarnished as a result.  Had Team Express not been fraudulently induced into buying this software, its business would have continued thriving; instead, however, the oversold software and implementation team took a business with an upward growth trajectory and bankrupted it.  On December 16, 2015, as a result of the devastating impact of this failed software, Team Express was forced to file a petition for relief under chapter 11 of the United States Code, 11 U.S.C.  §§ 101 *et seq.*  (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Texas, San Antonio Division (the "Bankruptcy Court"), commencing Bankruptcy Case No.  15-53044 (the "Bankruptcy Case") and creating the bankruptcy estate of Team Express (the "Estate").

2.   ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████

## II.   PARTIES

3.      Team Express is a limited liability company duly organized and existing under the laws of the state of Delaware, with its principal place of business at 5750 Northwest Pkwy #100, San Antonio, Texas 78249.  Team Express's members are citizens of California, Florida, Kansas, Massachusetts, Michigan, New Jersey, and Texas.

4.      Junction Solutions is a corporation duly organized and existing under the laws of the state of Delaware, with its principal place of business at 4643 South Ulster Street, Suite 400, Denver, Colorado 80237.  Junction conducts business in Texas and markets and sells Microsoft Dynamics AX, along with other products, in this county and throughout the United States. Junction has appeared and answered in this case.

5.      Microsoft is a corporation duly organized and existing under the laws of the state of Delaware, with its principal place of business at One Microsoft Way, Redmond, Washington 98052-6399.  Microsoft has appeared and answered in this case.

6.      RSM is a limited liability partnership duly organized and existing under the laws of the state of Iowa, with its principal place of business at One S. Wacker Drive, Suite 800, Chicago, Illinois, 60606.  RSM has appeared and answered in this case.

## III.   JURISDICTION AND VENUE

7.      Defendant Junction has already appeared and answered in this litigation, confirming that it is subject to personal jurisdiction and that venue is proper.  This court has

personal jurisdiction over Defendant Junction because it has purposefully availed itself of the privilege of doing business in Texas and has sought and obtained business benefit, advantage, and profit by availing itself of this jurisdiction.  This suit arises out of and relates to those contacts.  Defendant Junction further has substantial, continuous, and systematic contacts with the State of Texas, including sales efforts and software implementations directed to other Texas residents, including companies such as H.E.B.  Finally, the exercise of jurisdiction over Junction would not offend traditional notions of fair play and substantial justice and is not inconsistent with the constitutional requirements of due process.

8.     Defendant Microsoft has already appeared and answered in this litigation, confirming that it is subject to personal jurisdiction and that venue is proper.  This court has personal jurisdiction over Defendant Microsoft because it has purposefully availed itself of the privilege of doing business in Texas and has sought and obtained business benefit, advantage, and profit by availing itself of this jurisdiction, including the activities that form the basis of this suit.  This suit arises out of and relates to those contacts.  Defendant Microsoft further has substantial, continuous, and systematic contacts with the State of Texas, including sales efforts directed to other Texas residents.  Finally, the exercise of jurisdiction over Microsoft would not offend traditional notions of fair play and substantial justice and is not inconsistent with the constitutional requirements of due process.

9.     Defendant RSM has already appeared and answered in this litigation, confirming that it is subject to personal jurisdiction and that venue is proper. This court has personal jurisdiction over RSM because it resides in Texas and has continuous and systematic contacts with this state. RSM also engaged in a transaction after this lawsuit was filed that was intended to remove assets from Defendant Junction and place those assets outside the reach of Team

Express.  This activity was aimed specifically at this litigation in Texas and at Team Express, located in Texas.  The activity was intended to, and did, cause harm in Texas and was aimed specifically at this state, which subjects RSM to specific jurisdiction in this state. The exercise of jurisdiction over RSM would not offend traditional notions of fair play and substantial justice and is not inconsistent with the constitutional requirements of due process.

10.     Venue is proper in Bexar County, Texas, because all or a substantial part of the events or omissions giving rise to this matter occurred in whole or in part in Bexar County, Texas and because the Master Services Agreement between Team Express and Junction specifies that "any suit, action or proceeding brought by such Party against any other Party in connection with or arising from this Agreement shall be brought solely in any court located in Bexar County, Texas and each Party irrevocably consents to the personal jurisdiction of, and waives objections to venue in, each such court." Tex. Civ. Prac. & Rem. Code § 15.002(a)(1); Exhibit A (MSA) ¶ 14.  Defendants Microsoft and RSM also maintain offices in this county—specifically Concord Park II, 401 East Sonterra Boulevard, Suite 300, San Antonio, Texas 78258 and 100 N.E. Loop 410, Suite 1100, San Antonio, TX 78216, for Microsoft and RSM, respectively.

11.     Junction, on its own behalf and as agent for Microsoft, committed tortious acts in Bexar County, Texas, and the parties negotiated and Team Express executed the applicable contracts in Bexar County, Texas.  At the time of the implementation and at the time of filing this lawsuit, the Team Express executive team and the vast majority of its operations have been located in Bexar County, Texas.  Similarly, Bexar County had been the primary location for the software and services Junction and Microsoft provided Team Express.  A substantial portion of the fraudulent representations, contract activities, and the implementation project itself occurred at Team Express's offices located in Bexar County, Texas.  The fraudulent transfers described

herein were aimed at and directed toward this county and resulted in harm to Team Express in this county.

12.     The amount in controversy greatly exceeds the jurisdictional threshold for this court.

## IV.     FACTUAL BACKGROUND

13.     Team Express is a San Antonio-based multi-channel retailer that sells a wide range of sporting goods, primarily focusing on team sports such as football, baseball, basketball, soccer, and similar sports.  The company was founded in San Antonio as Southwest Baseball Supply in 1990 and has been in continual operation since.

14.     Since 1990, Team Express managed its operations on a software program called Ecometry, running on a 1990's-era Hewlett Packard mini-computer.  The aging software ran on a hardware platform that became increasingly hard to repair and maintain.  Nonetheless, the Ecometry system was reliable and met Team Express's needs.

15.     In January 2013, a group of investors led by Mark Marney purchased Team Express in a stock-purchase transaction.  Mr. Marney is an experienced businessman who previously founded and ran a successful e-commerce business called the Golf Warehouse.  The combination of Mr. Marney's successful track record in this industry alongside Team Express's longstanding business provided a foundation for solid growth and profitability.  That promise was borne out when, in fiscal 2014, less than two years after the new ownership group took over, sales were over 50% higher than the full year before the purchase—fiscal 2012.  The company was poised to build on that groundwork going forward—that is, until Defendants convinced Team Express to purchase and install the Microsoft Dynamics software.

### A.    The 2010–11 Investigation and Due Diligence.

16.    Back in 2010, Team Express began looking for a replacement for the COBOL Ecometry system, primarily because the aging Hewlett-Packard mini-computer on which it ran was becoming difficult to maintain.   The investigation was led by Brian Garcia, Chief Information Officer for Team Express.  During this process, Mr.  Garcia spoke with a number of the key players in enterprise software, including SAP, Oracle, Epicor, Ecometry, and Microsoft. Since  Team  Express  was  a  mid-sized  business,  Microsoft  responded  through  a reseller/integrator—specifically Defendant Junction. Microsoft's own sales representatives also participated in the sales efforts.

17.    Given that Team Express's needs were relatively straightforward and its business was not particularly complex, the company did not need or want an elaborate, hard-to-implement system that would require a great deal of effort and disruption in order to customize and implement.  Team Express made clear to Defendants what functionality it needed and that it wished to minimize any customization of the software so as to minimize the cost and difficulty of implementation.

18.    By January 2011, Team Express had narrowed the field to three finalists, SAP, Epicor, and Microsoft.   At that point, each of the finalists came to San Antonio and gave presentations and demonstrated their software to the Team Express management.  Junction, a Microsoft-authorized value-added reseller, presented Microsoft's ERP product—Dynamics AX. Based on the Junction presentation and representations about Microsoft Dynamics AX, that solution appeared to be the best fit for Team Express and was selected in the spring of 2011.  At the time, the most current version of Microsoft's offering was Dynamics AX 2009.  One key factor in this decision was the supposed fact—represented by Microsoft and Junction—that Dynamics AX was the easiest enterprise software to implement and would not require heavy

customization or a long implementation process.   Another key factor was Junction's representation that it had deep experience implementing Dynamics AX in the multi-channel retail segment; in fact, Junction had developed its own software supplement to Dynamics AX called "Junction MCR" which Junction claimed would create a seamless fit for Team Express.

19.    Junction provided Team Express with many promotional materials regarding the Microsoft Dynamics AX product, including an April 2010 glossy that claimed that Dynamics AX would: "Optimize purchasing and replenishment," and "reduce TCO with out-of-the-box support for critical payment integration."

20.    During the course of the parties' 2011 discussions, Junction (both on its own behalf and as agent for Microsoft) made a number of misrepresentations about how the Microsoft Dynamics software—together with Junction's supposed expertise in the multi-channel retail industry and its purported expertise in migrating customers from Ecometry to Dynamics—would greatly enhance the efficiency of Team Express's business operations without the need for a great deal of customization. During this process, Microsoft sales representatives, including Paul Warren, assisted and interacted directly with Team Express alongside Junction.

21.    Some of the specific misrepresentations include, but are not limited to the following:

- Repeated representations by a number of Junction personnel that, with a small number of specifically identified exceptions, Microsoft Dynamics AX would meet or exceed the functionality in the existing Ecometry software out-of-the-box, and that the small number of out-of-the-box gaps would be easily filled by Junction during implementation.

- On March 14, 2011, Junction's Daryl Tanner wrote to Team Express's Brian Garcia: "The input from our three days was great and got us more excited as to what a great fit we are for Team Express not only from a functional perspective but also from an ease of implementation and company culture fit."

8

- On March 16-18, 2011, Junction presents and demonstrates Microsoft Dynamics AX and Junction's implementation expertise to Team Express executives in San Antonio.  Each Team Express department head presented their requirements and Junction demonstrated how the software would, supposedly, meet them.  Junction emphasized that they had done migrations from Ecometry before and claimed that their track record was "impeccable."  Junction further stated that the Microsoft Dynamics AX product would continue to get better "through continued innovation."

- On March 23, 2011, Microsoft's Paul Warren wrote to Team Express's Brian Garcia and Kevin Udell: "Junction's consultants are experts in delivery multi-channel retail/cross channel retail solutions and have many happy customers.  … Furthermore, Junction has a quality list of multi-channel retail customers similar to Team Express that proves our solution works well in addressing your business issues. ...   With Microsoft Dynamics AX and Junction, Team Express will receive the best of both worlds: (1) The "safety net" of working with the largest software company in the world—thus, a very strong 'vendor viability' story; (2) expert delivery consultants from a proven boutique multi-channel retail firm that can bring best practices from other similar customers.  Please know that after selling ERP systems for over 25 years, I know it is 'open heart surgery' on a business to implement new ERP solutions...  and it comes with inherent risk. However, by carefully conducting your 'due diligence,' you will see that selecting your ERP partners is critical to its success.  The combination of Team Express, Microsoft, and Junction make an outstanding team and we will succeed!"

- On March 29, 2011, Junction's Daryl Tanner wrote to Brian Garcia: "Microsoft's technical core is awesome now and will stay that way because of all the investment they are putting into the software.  It is an easy and flexible environment to work in and the investment being made by Microsoft is huge." Later, during a telephone call on or about June 5, 2015, Microsoft's Jen Cirks effectively admitted that this was untrue, when she characterized Dynamics AX, not as a powerful, "awesome" software suite, but instead as merely a "developers tool."

- On April 11, 2011, Junction's Daryl Tanner sent a document to Brian Garcia describing Microsoft Dynamics AX and Junction: "Reliable solution operating at over 13,104 customers worldwide … Uniquely designed for rapid implementation and deployment … Ecometry Replacement is our 'sweet spot' … [Dynamics is] mature, industry proven … Microsoft Dynamics AX and Junction Solutions MCR choice delivers the most value at the lowest risk because it's: Technology ready (Flexible, scalable, & fits your systems); Value ready (Eliminates hidden costs associated with expensive integration and interoperability challenges); Business ready (Proven solution for multi-channel catalog, direct marketing business like yours); And it's - Team Express ready."

- On April 13, 2011, Junction's Daryl Tanner forwarded to Brian Garcia a Nucleus Research Guidebook for Microsoft Dynamics AX 2009 stating: "Deployed properly, Microsoft Dynamics AX can deliver payback in fewer than 18 months. … Because they can create the best replenishment plan using real-time inventory level data and leverage centralized warehouse facilities, retailers using Dynamics AX can identify opportunities to reduce overall inventory carrying costs. … Automating the management of campaigns and prices and streamlining other administrative tasks can enable managers to focus on providing high levels of customer service at minimal cost."

- On May 26, 2011, Junction sent Team Express its Proposal and Implementation Plan Response for Team Express ERP Project: "But more importantly, above and beyond that, Junction Solutions has vertically focused on the multi-channel retail industry and built award-winning intellectual property custom-suited to companies like Team Express.  With Junction MCR as the core ERP, Junction Solutions is uniquely positioned to meet and exceed your unique needs. ...  Our overall combined and fully integrated ERP solution that focuses on the MCR industry cannot be matched today.  ...We will make this project a success using our senior level MCR focused consultants, delivering value with least risk. ... Our call center, customer-service, and order-entry capabilities will enable Team Express representatives to efficiently handle requests across all channels, without duplicating those efforts across multiple systems.  … Junction MCR's advanced promotions management will meet Team Express's efforts now, and allow for more creativity and flexibility in future marketing initiatives.  Junction has spent a lot of time and effort understanding the unique fulfillment needs of MCR companies like Team Express.  … Team Express will have at its disposal the full resource pool of Microsoft support and consulting services behind Junction Solutions.  … While each of these customer segments has found Dynamics AX to be the most technically advanced enterprise-wide application on the market today, the real value proposition of Dynamics AX lies in its ability to satisfy current business requirements and remain flexible enough to adapt to future business needs. ...  Microsoft Dynamics AX has become the fastest growing ERP solution in the market today because it offers the most advanced technology and lowest total cost of ownership."

- Junction promised to provide MCR focused consultants on the project to deliver value with the least risk. In fact, Junction pursued a highly risky approach that flouted these promises.

- Junction and Microsoft told Team Express that Microsoft Dynamics AX was an ideal solution for mid-sized companies like Team Express and was designed specifically for them. To the extent that was ever true, it was certainly not true by the time the Team Express contract was signed and the project went live. Neither Microsoft nor Junction ever corrected these incorrect and untrue statements.

22.     The foregoing is just a sampling of many similar promises and representations made to convince Team Express to pick Microsoft and Junction for its ERP project.

23.     Team Express relied upon these, and many other similar representations, to select Microsoft and Junction as the team for its ERP software. But in the summer of 2011, just before signing, Team Express's owner at the time, Chase Capital, decided to delay the project. Junction, however, remained in contact with Team Express and updated Team Express regarding enhancements to the Microsoft Dynamics AX product.

**B.     The 2013–14 Investigation.**

24.     In January 2013, Chase Capital sold Team Express to an investor group led by Mark Marney.  Marney had previously founded, grown, and sold a similar company called The Golf Warehouse and brought a strong management track record with him to Team Express.

25.     By early 2014, Team Express was ready once again to examine options for transitioning from Ecometry to a modern system.  In doing so, Team Express relied on the prior investigation and representations from back in 2010–11, as well as reports from Junction in the intervening period about progress with the product (and the product roadmap) in the period since 2011.  Based on these representations, Team Express focused on the solution that had been most promising back then—Microsoft Dynamics AX and Junction Solutions.  Junction, both on its own behalf and as agent for Microsoft, reconfirmed its prior representations and told Team Express that the intervening years had done nothing but make the Microsoft product and the Junction team an even better fit for Team Express.

26.     For example, in 2012, Microsoft introduced Dynamics AX 2012 for Retail— purported to be a specialized system adapted for use in the retail industry.  Moreover, in March 2014 the Junction MCR module—created by Junction especially for multi-channel retail customers like Team Express—got the ultimate Microsoft stamp of approval: Microsoft bought

the product outright and the functionality would be written directly into Dynamics AX 2012 version R3, which would be the current version in 2014 when Team Express was to begin its implementation project.  As another example, in mid-2013 Microsoft purchased a warehouse package from Blue Horseshoe and wrote its warehouse software program, called WAX, directly into the Dynamics AX product as well.  According to Junction, the new WAX module would do everything Team Express's current software could do in the warehouse area plus additional functionality.

27.      As was the case in 2010–11, Junction (both on its own behalf and as agent for Microsoft) made a number of misrepresentations, including but not limited to:

- Representing that, as a part of Microsoft's inner circle, Junction was helping to steer future direction for AX (the product roadmap) in a way that would be beneficial for Team Express and that, as a result, the product is considerably better at meeting Team Express' requirements than it was when demonstrated in 2011.

- On April 1, 2014, Junction's Brion Reusche wrote to Brian Garcia: "I'm afraid I am not in a position, yet, to do an end-to-end demo of R3…setting up new demo environments ends up taking a long time, so we wait for RTM before doing that undertaking.  I could do demo on R2 and be sure to steer clear of the functions which aren't in R3... it is substantively the same capability, and the vast majority of our MCR functions made it in to the new release.  We actually just went thru that analysis on the final code-drop from Microsoft."

- Junction's Thad Neal repeatedly told Brian Garcia and others at Team Express that Microsoft Dynamics AX would greatly exceed the capabilities of the old Ecometry software.  Post-contract, on or about June 4, 2015, Mr.  Neal admitted the falsity of this pre-contract representation when he acknowledged in a telephone conference that Junction could not deliver (in brand-new 2015-era Microsoft software) the functionality Team Express had in its 1980's-vintage Ecometry software.

- During the 2013–14 investigation, Junction again claimed that it had deep experience and expertise in migrating Ecometry users (like Team Express) to Microsoft Dynamics AX.

- Junction promised that it would utilize sophisticated, proven implementation methodologies, including Microsoft Sure Step and its own ROI methodology. It did not.

- Junction told Team Express that its implementation would be greatly enhanced through the use of its own "accelerators" and a "template-based" approach. These proved, at best, to be far short of what they were represented.

28.     The foregoing is just a sampling of many similar promises and representations made in 2013–14 to convince Team Express to sign with Microsoft and Junction.  Team Express relied upon these, and many other similar representations, to select Microsoft and Junction as the team for its ERP software.

### C.     Team Express Signs the MSA and SOW Contracts

29.     Relying on these and other representations by Defendants, on April 18, 2014 Team Express signed a Master Services Agreement ("MSA") and Statement of Work ("SOW") with Junction, which included a license to Microsoft Dynamics AX software, sold by Microsoft through its agent, Junction.

30.     After signing the contracts, the parties worked to install and deploy the Microsoft software at Team Express.  That effort culminated when the new Junction/Microsoft Dynamics software went "live" at Team Express on February 23, 2015.  And from that day on, Team Express was in deep distress.

### D.     The Software Goes "Live" and Fails Spectacularly

31.     Microsoft's software and Junction's implementation were failures.  The software was unstable; it regularly failed, interrupting Team Express's entire business.  Its inner workings appeared to be a mystery to the supposed experts at Junction and even to Microsoft's own consultants, who were brought in to attempt to fix this disastrous project.  Documentation about the Microsoft software was lacking.  Junction's implementation work was plagued by missed deadlines, confusion, chaotic project oversight, lack of understanding about how the product

works and, most of all, a failure to identify and manage these problems in advance.  Instead, Junction recklessly proceeded to "go live" to find out how the software might perform, and foisted the pain of that decision onto Team Express.

32.     From the very outset, critical, widespread problems materialized.  These problems were felt most acutely in system stability; invoicing and payment processing; warehouse operations; fraud detection; promotions; and demand forecasting.

33.     Team Express initially could not reconcile its opening financial balances.  Invoices were delayed and wrong, forcing Team Express to do this process *manually* (after buying a supposedly cutting edge ERP software system to handle all aspects of its business).  Duplicate products were shipped to puzzled customers.  Some lucky customers got free product; others were charged multiple times for the same order.  Quite understandably, these customers were not happy; so they voiced their displeasure in online postings, reports to the Better Business Bureau, and complaints to the Texas Attorney General.  Instead of having access to modern business metrics and reports, Team Express was "flying blind," lacking the most basic information about its business due to the many flaws in the software.

34.     In payment processing, Team Express was promised that Junction had already built and would be able to deploy a direct interface between Microsoft Dynamics AX and Team Express's payment processor, Chase Paymentech.  But instead of a streamlined, seamless payment processing solution, Team Express got a system characterized by stunning performance errors.  Far from improving and streamlining the payment processing functions, Dynamics AX's payment processing solution brought Team Express to its knees.

35.     Then there were the warehouse problems.  Prior to signing, Junction repeatedly represented that Microsoft Dynamics AX R3's warehouse module, "WAX," would do

everything Team Express's legacy Ecometry system did and more.  Junction assured Team Express that it would love the new WAX capability and that it was better than the warehouse functionality available from Microsoft back in 2011.  But once the contract was signed, it became apparent that WAX was nothing like it was represented to be and that Junction was as confused by the module as Team Express.  For example, after go-live the number of warehouse replenishments (restocking bins in the warehouse—a time-consuming task for warehouse personnel) went up 600%, wreaking havoc with Team Express's warehouse operations.

36.     On a number of instances post-go-live, Junction acknowledged that the WAX warehouse module was "new to us too." Unfortunately, such candor was notably absent during the period in which Junction and Microsoft were working to convince Team Express to sign up.

37.     Another example is the fraud prevention functionality.  Once implemented, Team Express discovered that, contrary to pre-contract representations by Defendants, this aspect of the software only worked for phone orders, not Internet orders.  Not coincidentally, Team Express quickly suffered an Internet-based fraud attack, as scammers discovered that it was easy prey, resulting in almost $1 million in losses and forcing Team Express to purchase an add-on service costing $100,000 per year to do the fraud-prevention functionality Team Express was told would come with Dynamics out of the box.

38.     Yet another example is the security of the Dynamics AX system.  Any credible ERP system must maintain different security levels for different individuals within a company.  Dynamics AX indeed has this functionality.  But although Team Express trained and initially implemented security roles, post-go-live Junction determined that the security roles were interfering with its attempts to fix the numerous system crashes, performance issues, and other mission-critical problems introduced by Dynamics AX.  Thus, Junction told Team Express to

"open up" the system and eliminate all security settings, which effectively gave every employee access to all information in the system.  As of the date Team Express filed suit, this glaring hole remained.  And some of the "fixes" involved customized code that, apparently, will "break" if the security settings are turned back on, leaving Team Express in a quandary.

39.     And finally, Junction and Microsoft failed to provide Team Express with sufficient training materials for R3, which were a project deliverable, and failed to support the delivery of end user training materials through the promised "Train the Trainer" program.

**E.     After Team Express Filed this Lawsuit, Junction Transferred Substantially All of Its Assets to RSM While Retaining Liability for the Lawsuit**

40.     ███████████████████████████████████████████████████
███████

41.     After learning about the Junction transaction, Team Express requested that Junction produce the transaction documents so that Team Express could assess whether an RSM-related entity would be the proper party for the asserted claims in this lawsuit.

42.     Junction agreed to provide a heavily redacted version of the APA pursuant to an interim Protective Order that was negotiated between Team Express and Junction.  Junction produced the redacted APA on or about January 23, 2016.  (Exhibit C).

43.     ███████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

44.   ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

45.     On or about April 21, 2016, Team Express sought leave to add claims against RSM and others relating to the asset transfer. Thereafter, additional information was produced to Team Express about the APA and related transactions.

46.   ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

47.   ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

48. █████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████

49. █████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

50. █████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

51. █████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

52.    ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████

53.    ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

54.    ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████

55.    ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████

56.   ██████████████████████████████████████████████

████████████████████████████████████████████████████████

███████

57.   ██████████████████████████████████████████████

████████████████████████████████████████████████████████

██████

58.   ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████

59.   ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████

60.   ██████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████

61.　██████████████████████████████████████████

████████████████████

62.　RSM does not have any defenses, affirmative defenses, offsets, counterclaims, or other relief with regard to the allegations, causes of action, and remedies set forth in this Third Amended Complaint.

## V.　CAUSES OF ACTION

### A.　Fraud and Fraudulent Inducement by Junction and Microsoft.

63.　The allegations contained in the preceding paragraphs are incorporated herein by reference for all purposes.

64.　As described above, Junction and Microsoft fraudulently induced Team Express to enter into the MSA and SOW by making numerous affirmative, material misrepresentation to Team Express, making misleading partial disclosures, and failing to disclose material facts when they had a duty to do so regarding Junction's experience and capability in implementing the Microsoft Dynamics AX 2012 R3 product and regarding the Dynamics AX 2012 R3 product itself.  The affirmative misrepresentations include, but are not limited to, the statements and representations described above.  Many more misrepresentations were made but the truth of those representations will require discovery to prove.

65.　Knowing Team Express's business needs and goals for the ERP implementation, Junction enthusiastically recommended that Team Express license Microsoft Dynamics AX 2012 R3 and engage Junction to implement it.  Junction held itself out to be an expert and leader in the software implementation industry and, in particular, as an expert with a great deal of knowledge and experience in Microsoft Dynamics AX software implementation; ERP software for multi-channel retail companies like Team Express; and in migrating companies from Ecometry systems, like Team Express's legacy system, to Microsoft Dynamics AX.  But Junction

misrepresented its capability and experience to implement, configure, test, and deliver a Microsoft Dynamics AX system that met Team Express's needs.  Microsoft,    in    turn, recommended that Team Express hire Junction.  Defendants also misrepresented that the Dynamics AX product would meet Team Express's needs.  Defendants knew that the failure of either or both of the software or implementation services could lead to failure for Team Express's business.

66.    In addition to being liable for their affirmative misrepresentations, Defendants were under an affirmative duty to disclose material information pertaining to the project to Team Express, because: (1) the parties had a special relationship requiring full disclosure; (2) Defendants discovered new information as the project continued that made its earlier representations misleading or untrue; (3) Defendants created false impressions by making partial disclosures; and (4) Defendants voluntarily disclosed some information and therefore had duty to disclose the whole truth.  Despites their duties of disclosure, Defendants failed to disclose material information to Team Express knowing that Team Express was unaware of the facts and did not have an equal opportunity to discover such facts.

67.    Defendants' misrepresentations, misleading partial disclosures, and failure to disclose were material to Team Express, and at the time Defendants made such misrepresentations and concealment, they knew Team Express was unaware of the true facts and did not have an equal opportunity to discover them.  Defendants made such misrepresentations, misleading partial disclosures, and nondisclosures with the intent that Team Express enter the MSA and SOW.  Team Express reasonably relied upon such misrepresentations, misleading partial disclosures, and nondisclosures in doing so.  At    the    time    Defendants    made    such

misrepresentations, they knew they were false, or at the very least made such misrepresentations recklessly without knowledge of their truth and as positive assertions.

68.     Defendants intended that Team Express rely on these misrepresentations, and Team Express did, in fact, reasonably rely on them in selecting Microsoft Dynamics AX software and Junction's implementation services and in entering into the MSA and SOW.  Team Express also reasonably relied on Junction's purported expertise and accepted Junction's and Microsoft's recommendations both before and after the contract signing.

69.     As a result of Defendants' false and reckless misrepresentations, misleading partial disclosures, and nondisclosures, Team Express has been, and continues to be, damaged. Defendants should be held responsible for all actual damages as well as exemplary damages necessary to deter them from committing fraud and inflicting damage on other companies in the future.

**B.      Fraudulent Misrepresentation and Concealment by Junction and Microsoft ("String along Fraud").**

70.     The allegations contained in the preceding paragraphs are incorporated herein by reference for all purposes.

71.     The misrepresentations and nondisclosure continued even after the MSA and SOW were signed, thereby fraudulently inducing Team Express to "go live" in the first place and then to continue with the project even after the problems became apparent.

72.     Team Express relied upon Junction's and Microsoft's post-contractual misrepresentations, misleading partial disclosures, and nondisclosures to carry out its own obligations under the SOW and continue spending its own time, money, and resources in attempting futilely to make the Dynamics AX implementation work.

73.     As a result of these misrepresentations, misleading partial disclosures, and nondisclosures, Team Express has been damaged, and it continues to be damaged.

74.     Defendants should be held responsible for all actual damages as well as exemplary and punitive damages necessary to deter them from committing fraud and inflicting damage on other companies in the future.

**C.     Negligent Misrepresentation by Junction and Microsoft.**

75.     The allegations contained in the preceding paragraphs are incorporated herein by reference for all purposes.

76.     As set forth above, Junction and Microsoft made misrepresentations, misleading partial disclosures, and failure to disclose to Team Express.  Junction and Microsoft failed to exercise reasonable care or competence in communicating with Team Express.

77.     To the extent these misrepresentations, misleading partial disclosures, and failures to disclose were not intentional (and Team Express believes they were), they were at least negligent.  And as a result, Team Express has suffered damages.  These misrepresentations were inherently undiscoverable until the system was brought online and were not discovered until that point. Defendants concealed these misrepresentations.

78.     Defendants should be held responsible for all actual damages and because Defendants were grossly negligent in making misrepresentations to Team Express, they should also be held responsible for exemplary and punitive damages necessary to deter them from committing similar acts and inflicting damage on other companies in the future.

**D.     Breach of Contract by Junction.**

79.     The allegations contained in the preceding paragraphs are incorporated herein by reference for all purposes.

80.     In section 6 of the MSA, Junction promised and warranted that the services it would provide "shall be performed in a professional and workmanlike manner and shall comply in all material respects with the specifications set forth in the applicable SOW."

81.     Junction failed in many material respects to perform its obligations under the SOW in conformance with the contract and in a "professional and workmanlike manner." For example, the SOW specifies that the work will meet Team Express's specifications with "out-of-box functionality" from Dynamics AX 2012 R3, with only limited, specifically-identified exceptions.  Exhibit B (SOW at 6).  In fact, Dynamics' out-of-the-box functionality came nowhere close to meeting Team Express's needs.  Junction further promised that it would "demonstrate how to perform Team Express's business processes within the base Dynamics AX software." Given the utter failure of Dynamics AX software even to function as a practical matter, much less to perform Team Express's business processes, this promise was breached as well.  Exhibit B (SOW at 6).

82.     Junction failed to perform its responsibilities and obligations set forth in the MSA and SOW including, but not limited to: providing a fully functioning Microsoft Dynamics AX 2012 R3 that (i) met or exceeded the functionality of the legacy Ecometry system; (ii) met Team Express's business needs; (iii) actually worked; and (iv) is in accordance with the specifications outlined in the SOW.  Junction further failed to perform its obligations in a manner consistent with generally accepted industry standards; in a workmanlike manner; or in conformity with the specifications in the SOW.

83.     Team Express has fulfilled all of its obligations under the MSA and SOW or alternatively is excused from fulfilling those obligations based upon the breach of contract, fraud, and other malfeasance by Junction and Microsoft.

84.     As a result of Junction's failures and misconduct, it materially breached the MSA and SOW.  Each of the failures and misconduct has caused and continues to cause damage to Team Express.

85.     All conditions precedent have occurred or are excused.

**E.     Breach of Warranty by Junction.**

86.     The allegations contained in the preceding paragraphs are incorporated herein by reference for all purposes.

87.     Junction sold consulting and software implementation services to Team Express under the MSA and SOW.  As set forth above, Junction made representations and promises to Team Express concerning the existence, quality, and/or characteristics of the services that it would provide.  Junction further made representations about its alleged expertise and experience in the multi-channel retail industry; its expertise and experience in implementing Microsoft Dynamics AX in a competent manner; the capabilities and fit of the WAX warehouse module; and its expertise and experience in migrating customers from Ecometry to Microsoft Dynamics AX.  Team Express relied upon these representations and promises in entering into and continuing with, the MSA and SOW.

88.     The services provided were not in conformance with the representations and promises made by Junction.  Junction breached its warranty to Team Express, and Team Express suffered significant damages as a result.

**F.     Breach of Contract and Breach of Warranty by Microsoft.**

89.     The allegations contained in the preceding paragraphs are incorporated herein by reference for all purposes.

90.     Through its agent Junction, Microsoft sold Dynamics AX 2012 R3 software to Team Express.   (Exhibit I). Microsoft's agent, Junction, made numerous promises and

representations regarding the capabilities of the Dynamics product, including its ability to meet Team Express's needs; its ability to provide all functionality of the legacy Ecometry system, and then some; its low-risk profile as an established and widely used ERP product; its inclusion of functionality from Junction's prior MCR product, which was supposed to be included within Dynamics AX 2012 R3; and the suitability of the WAX warehouse module for Team Express.

91.     The Dynamics AX 2012 R3 product did not conform to the representations and promises made by Microsoft's agent, Junction, and did not conform to the Warranty provided by Microsoft. (Exhibit I).  Microsoft breached its warranty to Team Express, and Team Express suffered significant damages as a result.

**G.     Negligence and Gross Negligence Against Junction and Microsoft.**

92.     The allegations contained in the preceding paragraphs are incorporated herein by reference for all purposes.

93.     In undertaking to implement the Microsoft Dynamics software at Team Express, Junction owed Team Express a duty of reasonable care.  Junction held itself out to be an expert in software implementation in general, with particular expertise in i) implementing Microsoft Dynamics software; ii) implementing Microsoft Dynamics software at retailers like Team Express; and iii) migrating companies from Ecometry software to Microsoft Dynamics.  As such, Junction was required to act as a professional of ordinary prudence.  Microsoft similarly undertook to assist Junction in its flailing attempts to get the Microsoft Dynamics software to work and Microsoft held itself out to be expert in the design and functioning of its own Dynamics software.  Both Junction and Microsoft failed to exercise reasonable care in their respective efforts in connection with the failed implementation at Team Express.

94.     Junction and Microsoft were well aware of the risks to a company implementing ERP software like Microsoft Dynamics, yet Junction proceeded to "go live" at Team Express

despite its apparent lack of knowledge about many aspects of the Microsoft Dynamics AX 2012 R3 product and without taking reasonable steps to minimize any risk to Team Express's business if the Dynamics product failed.  Microsoft allowed Junction to "go live" despite Microsoft's own befuddlement with the 2012 R3 version of its software, which was brand new when it was entrusted with Team Express's entire business, much to Team Express's detriment.

95.     Junction's and Microsoft's actions and failures to act in a reasonably prudent manner constitute negligence and breached their respective duties to Team Express.

96.     Junction's and Microsoft's actions and failures to act in a reasonably prudent manner further constitute gross negligence.  Junction was aware at the time it lured Team Express into the MSA and SOW and at the time it brought Microsoft Dynamics "live" that doing so involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Team Express.  Microsoft was also aware of this risk.  Junction and Microsoft each had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of Team Express.

97.     This negligence and gross negligence by both Junction and Microsoft proximately caused injury to Team Express.

**H.     Alternative Theories of Liability Against Microsoft.**

98.     The allegations contained in the preceding paragraphs are incorporated herein by reference for all purposes.

99.     Junction and Microsoft held themselves out to Team Express as partners and shared a common benefit, and they acted in concert.  To the extent that Microsoft contends that it is not responsible for the actions of its authorized, value-added reseller, Team Express pleads these alternative theories of liability against Microsoft:

28

### 1.   *Civil Conspiracy between Junction and Microsoft*

100.    Microsoft is liable for the acts of Junction because they acted in combination to achieve a common goal and joined together in a conspiracy to induce Team Express into the MSA and SOW.  Junction and Microsoft were members of the conspiracy, the object of which was to accomplish an unlawful purpose or a lawful purpose by unlawful means, such as fraudulent inducement as well as the other unlawful means pleaded herein; they had a meeting of the minds on the object or course of action; one or both of them committed an unlawful, overt act to further the object or course of action; and Team Express suffered injury as a proximate result of the wrongful act.

### 2.   *Joint Enterprise between Junction and Microsoft*

101.    Microsoft is vicariously liable for the acts of Junction during the pre-contract period and implementation because they acted as a joint enterprise.  They had an express or implied agreement, a common purpose to be carried out by the enterprise, a community of pecuniary interest in that common purpose, and an equal right to direct and control the enterprise.  Microsoft is responsible for Junction's conduct, representations, and nondisclosures during the joint enterprise.

### 3.   *Aiding and Abetting by Microsoft*

102.    Microsoft is responsible for both aiding and abetting by assisting and participating in causing a tortious result.  During the pre-contract period, Junction and Microsoft provided information about Microsoft Dynamics and Junction's services that were untrue and misleading. This behavior misled and fraudulently induced Team Express to enter into the MSA and SOW. Microsoft provided substantial assistance to Junction to accomplish the tortious result, and, as explained herein, Junction's conduct was a breach of its duties to Team Express.  Microsoft's

actions were a substantial factor in causing the fraudulent inducement and, therefore, Team Express's injuries.

### 4. *Microsoft is Liable for Junction's Actions Under Agency Principles*

103. During the pre-contract period, Junction acted as the actual or apparent agent of Microsoft in representing the qualities and capabilities of the Microsoft Dynamics software and demonstrating and explaining its functionality and capabilities.

104. Microsoft designated Junction as an authorized reseller of Dynamics AX software and in fact required small enterprises like Team Express to purchase the software through resellers such as Junction. In fact, Microsoft specifically recommended Junction to Team Express. Microsoft further designated Junction as a premier partner with a Gold Certification and named Junction to the Microsoft Business Solutions Inner Circle.

105. Junction was acting within the scope of this agency when it made representations to Team Express about Microsoft Dynamics AX software, as described herein. Microsoft is liable for its agent's pre- and post-contract representations, statements, and activities regarding Microsoft's Dynamics AX software.

### I. Avoidance, Preservation, and Return of Actual Fraudulent Transfers Under TUFTA[1] § 24.005 Against Junction and RSM

106. The allegations contained in the preceding paragraphs are incorporated herein by reference for all purposes.

---

[1] References to the Texas Uniform Fraudulent Transfer Act ("TUFTA") shall mean TEX. BUS. & COM. CODE ANN. § 24.001 et seq. The Fifth Circuit has found that the forum's law should apply, and no choice-of-law analysis is even necessary, when the laws of the states do not conflict. *See Schneider Nat'l Transp. v. Ford Motor Co.*, 280 F.3d 532, 536 (5th Cir. 2002). Most states, and each of the potentially relevant states to the fraudulent transfer claims alleged herein, have adopted the Uniform Fraudulent Transfer Act (the "UFTA"). *See Janvey v. Alguire*, 2013 U.S. Dist. LEXIS 82568, at 51 (N.D. Tex. Jan. 22, 2013) ("[S]ince the Court would look to the same body of cases applying the law of any UFTA-enacting state, the Court would reach the same conclusion regardless of which UFTA jurisdictions law that it applied."). Nonetheless, to the extent that this Court determines that another state's fraudulent transfer law applies to the facts alleged herein, Team Express respectfully submits that it has pled facts sufficient to show violations of any state's fraudulent transfer law.

107. ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████

108. ███████████████████████████████████████

████████████████████████████████████████████████

██████

109. ███████████████████████████████████████

███████████████████████████████████

     a. ████████████████████████████████

        ████████████████████████████████

        ████████████████████████████████

        ████████████████████████████████

        ████████████████████████████████

        ██

     b. ████████████████████████████████

        ███

     c. ████████████████████████████████

        ████████████████████████████████

        ████████████████████████████████

        ███████████████████████████

     d. ████████████████████████████

e. 

f.

110.    Courts determine actual intent to defraud by considering certain "badges of fraud" as provided in TUFTA.   Several of the badges of fraud exist here, as explained above. Therefore, the Transfers are fraudulent transfers in violation of TUFTA § 24.005(a)(1) and/or (b).

111.    ████████████████████████████████████████████

112.    ████████████████████████████████████████

113.    Based upon the foregoing allegations stated in this Amended Complaint, the Transfers are subject to avoidance pursuant to TUFTA § 24.005(a)(1), (b), and 24.008.   Team Express is entitled to a judgment (a) avoiding and preserving the Transfers for the Estate; (b) directing that the Transfers be set aside; (c) recovering the Transfers, or the value thereof, from RSM for the benefit of the Estate; and (d) imposing a constructive trust on any money or assets acquired by, and which unjustly enriched, RSM.

**J.    Avoidance, Preservation, and Return of Constructively Fraudulent Transfers Under TUFTA § 24.005(a)(2) Against Junction and RSM**

114.    The allegations contained in the preceding paragraphs are incorporated herein by reference for all purposes.

115.    ████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████

116.    J███████████████████████████████████████████████

██████████████████████████████████████████████████

117.    ████████████████████████████████████████████████

████████████████████████████.

118.    ████████████████████████████████████████████████

██████████████████████.

119.    ████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████

120.    The Transfers are fraudulent transfers in violation of TUFTA §§ 24.006(a) and 24.005(a)(2).

121.    ██████████████████████████████████████████████

122.    ████████████████████████████████████████████████

██████████████████████████.

123.    Based upon the foregoing allegations, such Transfers are subject to avoidance pursuant to TUFTA §§ 24.006(a), 24.005(a)(2), and 24.008.   Team Express is entitled to a

judgment (a) avoiding and preserving the Transfers for the Estate; (b) directing that the Transfers be set aside; (c) recovering the Transfers, or the value thereof, from RSM for the benefit of the Estate; and (d) imposing a constructive trust on any money or assets acquired by, and which unjustly enriched, RSM.

### K.    Civil Conspiracy to Violate TUFTA Against Junction and RSM

124.    The allegations contained in the preceding paragraphs are incorporated herein by reference for all purposes.

125.    ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████

126.    ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████.

127.    ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████

128. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

**L.     Successor Liability Against RSM**

129.     The allegations contained in the preceding paragraphs are incorporated herein by reference for all purposes.

130.     By virtue of the above-pled fraudulent transfer causes of action, RSM is subject to successor liability for the debts of Junction under the fraudulent transaction doctrine of Delaware law.

**M.     Reservation of Rights**

131.     The allegations contained in the preceding paragraphs are incorporated herein by reference for all purposes.

132.     Team Express had to retain attorneys to prepare, file, and prosecute this action and has incurred fees and expenses in connection therewith.

133.     TUFTA § 24.013 provides for the recovery of "costs and reasonable attorney's fees as are equitable and just."

134.     Based on the facts and circumstances surrounding the fraudulent acts described herein, it is equitable and just that Team Express recover for its costs and reasonable attorney's fees. Accordingly, pursuant to TUFTA § 24.013 Team Express seeks recovery of costs, including reasonable attorney's fees and expenses incurred by Team Express in connection with the preparation and filing of all pleadings in this case and in prosecuting the same.

### N.        Exemplary Damages

135.    The allegations contained in the preceding paragraphs are incorporated herein by reference for all purposes.

136.    In addition to actual damages and to the fullest extent allowed under applicable law, Team Express seeks exemplary damages under its claims for fraud, fraudulent inducement, string-along fraud, fraudulent transfer, gross negligence, and negligent misrepresentation.

137.    Because Defendants have committed acts that violate criminal statutes, including Texas Penal Code § 32.46, Team Express's recovery of exemplary and punitive damages is not limited by the application of any law, including Section 41.008(b) of the Texas Civil Practice & Remedies Code.

138.    Defendants actions as set forth herein were fraudulent; grossly negligent; and/or conducted with malice.  Punitive damages are necessary and just in order to penalize Junction, Microsoft, and RSM for their outrageous conduct.  These are not just isolated acts of fraud, gross negligence, and wrongful conduct, but a persistent and wide-ranging pattern of deceptive and intentional conduct.  By engaging in these tactics, Defendants sought to profit, and in fact to learn about their own newly revised software, at the expense of Team Express.  That conduct continued even after Team Express filed this lawsuit, when the Defendants transferred Junction's assets to RSM, and essentially stripped Junction of substantially all of the assets that would otherwise be available to pay a judgment in this matter. As such, Team Express should be awarded punitive damages.

### O.        Texas Rule of Civil Procedure 47

139.    In accordance with Texas Rule of Civil Procedure 47, Team Express states that it seeks monetary relief over $1 million in addition to attorneys' fees, pre- and post-judgment interest, exemplary damages, and court costs.

## VI.    ATTORNEYS' FEES

140.    Team Express has been required to employ counsel to represent its interests as a result of the foregoing causes of action.  Team Express seeks all reasonable and necessary attorneys' fees, expenses and costs of court for the work done prior to and at trial, on appeal to the Fifth Circuit Court of Appeals and, if applicable, to the Supreme Court pursuant to applicable law.

## VII.    JURY DEMAND

141.    Team Express demands a trial by jury on all issues.

## VIII.    PRAYER

WHEREFORE, Plaintiff Team Express Distributing LLC respectfully requests that Defendants Junction Solutions, Inc., Microsoft Corporation, and RSM be cited to appear and answer herein and upon final hearing, that Team Express be awarded:

a)    all actual damages caused by Defendants;

b)    exemplary damages;

c)    avoidance of the fraudulent transfers of assets from Junction to RSM;

d)    a constructive trust upon the assets formerly belonging to Junction as well as the proceeds from the sale of those assets;

e)    attachment of the assets formerly belonging to Junction as well as the proceeds from the sale of those assets;

f)    an injunction against further disposition of the assets of Junction;

g)    reasonable and necessary attorneys' fees;

h)    pre- and post-judgment interest;

i)    costs of court; and

j)    such other and further relief, both at law and in equity, to which plaintiff may justly show itself entitled.

Dated:  April 12, 2017                          Respectfully submitted,

                                                **MCKOOL SMITH, P.C.**

                                                */s/ Scott L.  Cole*
                                                Scott L. Cole
                                                scole@mckoolsmith.com
                                                Texas Bar No. 00790481
                                                Matt Rappaport
                                                mrappaport@mckoolsmith.com
                                                Texas Bar No. 24070472
                                                Andrew D. Whalen
                                                awhalen@mckoolsmith.com
                                                Texas Bar No. 24098604

                                                McKool Smith, P.C.
                                                300 West 6th Street
                                                Suite 1700
                                                Austin, Texas 78701
                                                (512) 692-8700 (phone)
                                                (512) 692-8744 (fax)

                                                *Attorneys for Plaintiff*
                                                *Team Express Distributing LLC*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has

been served on all counsel of record via the Court's ECF system on April 12, 2017.

                                                */s/ Scott L. Cole*
                                                Scott Cole